In re:                                    )          Case No.  05-22369
                                          )
WANDA L. DAWSON,                          )          Chapter 13
    Debtor.                               )
                                          )
WANDA L. DAWSON,                          )          Adversary Proceeding No. 05-1463
    Plaintiff,                            )
                                          )          Judge Arthur I. Harris
    v.                                    )
                                          )
J & B DETAIL, L.L.C., *et al.*,           )
    Defendants.                           )

## MEMORANDUM OF OPINION

On September 8, 2005, the debtor, Wanda L. Dawson, commenced this

adversary proceeding against defendants J & B Detail, L.L.C. ("J & B"), and

J & B's owner and president, Judy Simone.  Dawson seeks damages under former

subsection 362(h) of the Bankruptcy Code and several other provisions of federal

and state law.  This adversary proceeding involves the parties' actions in

connection with a device – the "On-Time Payment Protection System" – that

J & B installed on a 1996 Mustang, which J & B had sold to Dawson about seven

months before Dawson filed her Chapter 13 case on August 17, 2005.  This

device could render Dawson's car inoperable unless a new payment code was

timely entered or the device itself was removed.  For the reasons that follow, the

Court finds that Dawson is entitled to $500 in damages from the defendants, plus

costs and attorneys fees, under former subsection 362(h) of the Bankruptcy Code. In addition, the Court submits proposed findings of fact and conclusions of law recommending that the district court enter judgment in favor of the defendants on Dawson's remaining claims, which do not arise under the Bankruptcy Code and which go beyond a bankruptcy judge's authority to enter final judgment, absent the parties' consent under 11 U.S.C. § 157.

## FINDINGS OF FACT AS TO DAWSON'S CLAIM UNDER FORMER SUBSECTION 362(h) OF THE BANKRUPTCY CODE AND *PROPOSED* FINDINGS OF FACT AS TO DAWSON'S REMAINING CLAIMS, *I.E.*, THOSE NOT ARISING UNDER TITLE 11

On April 27, 2006, the Court conducted a bench trial. Much of the testimony was conflicting, and the Court found reason to question the credibility of some of each witness's testimony. After evaluating the testimony and exhibits, the Court makes the following findings of fact as to Dawson's claim under former subsection 362(h) of the Bankruptcy Code and *proposed* findings of fact as to Dawson's remaining claims, *i.e.*, those not arising under Title 11.[1]

---

[1] The findings of fact contained in this memorandum reflect the Court's weighing of evidence, including consideration of the credibility of the witnesses. "In doing so, the court considered each witness's demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court has considered the testimony of all the witnesses, as well as all exhibits admitted into evidence.

2

On January 28, 2005, Dawson purchased a 1996 Mustang from J & B for $4,999. Dawson paid $2,800 in cash and financed the balance with J & B, agreeing to pay $100 twice monthly for approximately sixteen months. The vehicle was equipped with the "On-time Payment Protection System" ("the on-time system"). With each bimonthly payment, J & B would give the vehicle's owner a new code that would be entered into the system via a small keypad. Each new code would be good for approximately twenty days. So long as the owner was current in her payments and entered each new code, a green light on the on-time system would be lit. If, however, payment was past due and a new code had not been entered, a red light would blink, and the on-time system would make a beeping sound. The red light would blink progressively faster the longer the payment was past due. The blinking and beeping would continue during a pre-set "grace period," which was usually programmed to extend five days beyond the payment due date, although programming errors could shorten or lengthen the grace period by a few days. Early on the morning when the grace period expired, the on-time system would disable the vehicle's ignition so that the engine could not be started until a new code was entered. The on-time system would not stop the vehicle if it was already running, but once the vehicle was turned off, it could not be restarted without a new code.

3

Prior to filing for bankruptcy, Dawson made all of her $100 bimonthly payments to J & B in sufficient time – *i.e.*, including the grace period – so that the on-time system never disabled her Mustang's ignition system.

At some point in time, J & B began providing new purchasers of its cars with an emergency code, which would enable the vehicle to start for an additional 24 hours. It is not clear whether Dawson's Mustang was programmed with an emergency code; however, the Court finds by a preponderance of the evidence that no such code was effectively communicated to Dawson either at the time she purchased the vehicle or at anytime after she advised J & B that she had filed for bankruptcy.

Most of J & B's customers who purchased cars with the on-time system did not understand how the on-time system worked. Richard Paytosh was employed as a mechanic and assistant manager for J & B in 2005 until he quit without notice sometime in October 2005. Paytosh testified that he would enter the new codes for most of the customers when they came in to make their payments. Thus, customers knew little about how the on-time system operated. For example, some may well have believed that J & B could remotely disable a car with the on-time system. Indeed, Dawson's complaint alleged (incorrectly) that the on-time system allows the creditor to deactivate the car's ignition by the push of a button

4

(Docket #1 at ¶15). Dawson's complaint also alleged (incorrectly) that Simone used the on-time system to shut down the engine of the Mustang. *Id.* at ¶24.

On Wednesday, August 17, 2005, Dawson went to attorney Romano's office to complete her bankruptcy papers for filing. After visiting with attorney Romano in the morning, Dawson telephoned J & B in the afternoon to inform J & B that she had filed for bankruptcy and to request that the on-time system be overridden. Dawson spoke with Judy Simone, president and owner of J & B. Although Dawson believed that her attorney had already filed her bankruptcy case when she spoke with Simone on the afternoon of August 17, 2005, the bankruptcy case was not filed until later that afternoon – at 5:26 p.m.

During the telephone conversation between Dawson and Simone on the afternoon of August 17, 2005, Simone refused to give Dawson a new code that would keep the on-time system from deactivating the car's ignition, unless Dawson made another payment. Simone knew that Dawson's car payment was past due and that the on-time system would soon deactivate the car's ignition when the grace period expired, unless a new payment code was entered or the device was removed. Simone also responded to Dawson's request with various collection efforts and threats, for example, saying that the car could not "be on the bankruptcy" and that Dawson needed to talk to her attorney about taking the car

5

"off the bankruptcy." At the time of this conversation, Dawson's Chapter 13 petition had yet to be filed. Nor did Dawson provide Simone with a case number or other evidence that a bankruptcy case had actually been filed.

Later in the afternoon of August 17, 2005, Attorney Romano first provided J & B with notice, via telefax, that Dawson's bankruptcy case had been filed. The fax cover sheet included the debtor's name and Case No. 05-22369. The comment section provided:

> To Whom it May Concern:
> Please find the Notice of the Filing of A Bankruptcy attached for your records. 11 U.S.C. § 362 imposes an Automatic Stay of Prosecution against Ms. Dawson as part of her bankruptcy protection. As it pertains to your dealership, it directly affects your ability to further utilize the "kill switch" that you currently have installed in her car. As the amount owed to your company [is] included for full payment from the Chapter 13 Trustee, you are hereby given notice that any future use of the "kill switch" against my client is strictly forbidden. Any use of the "kill switch" for failure of Ms. Dawson to make payment to your company directly will be met with action from within the Bankruptcy Court. Payment, hereafter, will be provided to you by the Chapter 13 Trustee. If you have any questions, please feel free to contact my office at your earliest convenience.

Accompanying the fax cover sheet was a written notice from the bankruptcy court acknowledging that Wanda L. Dawson filed a Chapter 13 case on August 17, 2005, at 5:26 p.m. The fax cover sheet and bankruptcy notice were sent to J & B by telefax at approximately 5:39 p.m. on Wednesday, August 17, 2005. J & B was closed at 5:00 p.m. that day. Sometime during the morning of Thursday,

6

August 18, 2005, Simone first became aware that a fax had been sent from Dawson's attorney and that Dawson had, in fact, filed for bankruptcy.

Sometime on August 18 or 19, 2005, Dawson's husband attempted to disable the on-time system prior to the anticipated shut off date of August 20, 2005. The ignition continued to work after Dawson's husband pulled out some wiring and part of the on-time system; however, the on-time system no longer blinked and beeped. The Court finds, by a preponderance of the evidence, that the on-time system disabled the Mustang's ignition sometime early Saturday morning, August 20, 2005. The Court makes no findings regarding any subsequent attempts that Dawson's husband may have made to render the Mustang operable.

On Saturday, August 20, 2005, Richard Paytosh, J & B's mechanic and assistant manager, showed up alone in a J & B vehicle at Dawson's home. Dawson refused to tell Paytosh where the Mustang was. Paytosh left without seeing the Mustang.

On Thursday, September 1, 2005, J & B dispatched a tow truck to bring in the Mustang. Dawson rode in the cab of the tow truck as the Mustang was towed to J & B. After removing the on-time system, Paytosh advised Dawson that the Mustang would not start.

On September 3, 2006, J & B had the vehicle towed to a car repair shop,

7

Mr. C and Me, Inc. ("Mr. C's"), which provided J & B with a $500 repair estimate. J & B refused to have the Mustang repaired unless Dawson agreed to pay for the repairs. Dawson refused to sign a work order.

On September 8, 2005, attorney Romano filed an adversary complaint against J & B and Simone. Romano mailed copies of the summonses and complaint on September 20, 2005. On September 27, 2005, Simone filed an answer *pro se*. On October 17, 2005, an amended answer was filed by counsel on behalf of both J & B and Simone. An initial pretrial was held on October 27, 2005.

On November 3, 2005, Paytosh, who had quit working at J & B in October, returned to J & B at Simone's request to repair Dawson's Mustang. Paytosh made some repairs to the ignition system, and the Mustang was again operational. At trial Paytosh testified "Mr. C's was the one that told me exactly what was wrong with it and what needed to be done." Previously, counsel for the defendants indicated that Paytosh located a pinched wire in the ignition system and replaced it. The Mustang was returned to Dawson on November 3, 2005, at no expense to her.

## Credibility Determinations

The outcome of this proceeding rests in large part on credibility determinations. Depending upon whose testimony the Court accepts, the debtor

8

may be entitled to no recovery or may well be entitled to both actual and punitive damages. For example, did Dawson's husband disable the Mustang when he attempted to remove the on-time system? Or would the Mustang still start? Did Paytosh come to Dawson's home on Saturday, August 20, 2005, to repossess the Mustang? Or did he intend to take the Mustang only long enough to remove the on-time system? Was Paytosh telling the truth when he purportedly told attorney Romano's paralegal that the need for additional repairs on the Mustang was a ruse to avoid having to return the debtor's Mustang? Or was Paytosh telling the truth when he testified that he made no such statements to attorney Romano's paralegal? Unfortunately, there is little evidence to assist the Court in corroborating the often conflicting testimony presented in the courtroom. In the end, the Court has simply done its best to resolve this conflicting testimony. The Court acknowledges that the outcome might well have been different had the burden of proof been switched or had the standard of proof been something other than preponderance of the evidence.

9

CONCLUSIONS OF LAW AS TO DAWSON'S CLAIM UNDER FORMER
SUBSECTION 362(h) OF THE BANKRUPTCY CODE AND *PROPOSED*
CONCLUSIONS OF LAW AS TO DAWSON'S REMAINING CLAIMS, *I.E.*,
THOSE NOT ARISING UNDER TITLE 11

*I. Jurisdiction*

*A. Dawson's Claim for Damages under Former Subsection 362(h) of the
Bankruptcy Code Is a Core Proceeding for Which Subject Matter Jurisdiction
Exists under 28 U.S.C. § 1334.*

To the extent that Dawson's complaint seeks damages for alleged violations

of the automatic stay, it constitutes a core proceeding under 28 U.S.C.

§ 157(b)(2)(A) and (O). *See In re Pawlowicz*, 337 B.R. 640, 645 (Bankr. N.D.

Ohio 2005); *see also MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006).

The Court has jurisdiction over core proceedings under 28 U.S.C. §§ 1334 and

157(a) and Local General Order No. 84, entered on July 16, 1984, by the United

States District Court for the Northern District of Ohio.

*B. Dawson's Nonbankruptcy Claims Against J & B and Simone Are Non-core
Proceedings for Which "Related To" Subject Matter Jurisdiction Exists under
28 U.S.C. § 1334.*

Dawson's complaint also contains some nonbankruptcy claims that are

non-core proceedings. These nonbankruptcy claims are based upon (1) the Fair

Debt Collection Practices Act, (2) the Ohio Retail Installment Sales Act, and (3)

the Consumer Sales Practices Act. "A core proceeding either invokes a

10

substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 482 (6th Cir. 1992). Each of the Dawson's nonbankruptcy claims is predicated on substantive rights that exist outside of bankruptcy. While the adversary proceeding is focused on violation of the automatic stay, the nonbankruptcy claims are factually tied to the on-time system itself and the defendant's actions once the device disabled the vehicle. These claims cannot be said to arise "but for" Dawson's bankruptcy. *See In re Lowenbraun*, No. 06-6032, __ F.3d __, 2006 WL 1836056 (6th Cir. July 6, 2006). Therefore, the nonbankruptcy claims are non-core proceedings.

Not all parties have consented to the bankruptcy judge rendering a final judgment on non-core proceedings, so the Court could may only hear those non-core proceedings to the extent that subject matter jurisdiction exists under 28 U.S.C. § 1334 and may only make a recommended decision to the district court as to those non-core proceedings pursuant to 28 U.S.C. § 157(c)(1). Whether subject matter jurisdiction exists over these nonbankruptcy claims is a question that requires further analysis.

The jurisdiction of federal district courts in bankruptcy matters is set out at 28 U.S.C. § 1334, which provides in relevant part:

11

(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

(b) . . . [T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

If a district court has bankruptcy jurisdiction over a case, 28 U.S.C. § 157(a) allows the court to refer the case to the bankruptcy court. Pursuant to 28 U.S.C. § 157(a) and Local General Order No. 84, entered on July 16 1984, by the United States District Court for the Northern District of Ohio, the district court has referred to the bankruptcy judges of the district "any and all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11."

For the purpose of determining whether a particular matter falls within bankruptcy jurisdiction, it is not necessary to distinguish between . . . proceedings "arising under," "arising in," and "related to" a case under title 11. These references operate conjunctively to define the scope of jurisdiction. Therefore, for purposes of determining section 1334(b) jurisdiction, it is necessary only to determine whether a matter is at least "related to" the bankruptcy.

*In re Wolverine Radio*, 930 F.2d 1131, 1141 (6th Cir. 1991).

"A matter is related to a bankruptcy case if 'the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.' " *Sanders Confectionery Products, Inc. v. Heller Fin., Inc.*, 973 F.2d

12

474, 482-83 (6th Cir. 1992) (quoting *In re Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984) (emphasis omitted)). "The matter need not directly involve the debtor, as long as it 'could alter the debtor's rights [or] liabilities,' but an 'extremely tenuous connection' will not suffice." *Id.* (quoting *In re Wolverine Radio*, 930 F.2d at 1142). *See also Celotex v. Edwards*, 514 U.S. 300, 307-08 & n.6 (1995) (discussing *Pacor* and other tests adopted by circuit courts for determining "related to" jurisdiction under 28 U.S.C. § 1334).

In the present case, Dawson's nonbankruptcy claims against J & B and Simone constitute property of the debtor's estate under 11 U.S.C. §§ 541 and 1306. Under 11 U.S.C. § 1327, all property of the estate vests in the debtor upon confirmation, "[e]xcept as otherwise provided in the plan." Dawson's Chapter 13 plan, which was confirmed on March 10, 2006, expressly provided that "[a]ll property of the estate . . . shall remain property of the estate and in the possession of the debtor until the case is closed, dismissed, or converted . . . ." Docket #21 at ¶14. Therefore, these nonbankruptcy claims remain property of the estate notwithstanding confirmation of Dawson's Chapter 13 plan.

Under these circumstances, the outcome of Dawson's nonbankruptcy claims against J & B and Simone would affect property of the estate and would conceivably affect the success of Dawson's ongoing Chapter 13 plan. *See Sanders*

13

*Confectionery Products*, 973 F.2d at 482-83; *compare In re Rivera*, 186 B.R. 505

(D. Kan. 1995) (Chapter 13 debtor's postconfirmation adversary proceeding

against former employer under 42 U.S.C. § 1983 was within bankruptcy court's

"related to" jurisdiction), *with In re Clayter*, 174 B.R. 134, 140-41 (Bankr. D. Kan.

1994) (Chapter 13 debtors' postconfirmation adversary proceeding seeking

damages for purchase of home constructed on allegedly contaminated property

was not within bankruptcy court's "related to" jurisdiction in part because

property had revested in the debtors under 11 U.S.C. § 1327(b)). Accordingly,

subject matter jurisdiction exists over Dawson's nonbankruptcy claims against

J & B and Simone under 28 U.S.C. § 1334, although the undersigned bankruptcy

judge may only make a recommended decision to the district court as to those

non-core proceedings pursuant to 28 U.S.C. § 157(c)(1).[2]

---

[2]    The Court notes that Dawson also asserts jurisdiction under 28 U.S.C.
§ 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental
jurisdiction). To the extent that jurisdiction is based on a statutory provision other
than 28 U.S.C. § 1334, the undersigned bankruptcy judge lacks authority to hear it
by virtue of 28 U.S.C. § 157(a) and (b)(1). *See In re Premium Escrow Services,
Inc.*, 342 B.R. 390, 402-03 (Bankr. D.D.C. 2006) (noting that 28 U.S.C. § 157(a)
appears to restrict the district courts' ability to transfer matters to bankruptcy
courts to those proceedings over which the district courts have jurisdiction under
28 U.S.C. § 1334). While sections 1331 and 1367 are valid jurisdictional bases
for *civil actions* filed in district court, the only jurisdictional basis for a district
court or a bankruptcy court to hear an *adversary proceeding commenced within a
pending bankruptcy case filed under Title 11* is under the broad, but not unlimited,
jurisdiction conferred under 28 U.S.C. § 1334. Therefore, if the district court

14

*II. Dawson's Claim under Former Subsection 362(h) of the Bankruptcy Code*

The filing of a bankruptcy petition gives rise to an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Former subsection 362(h) (now subsection (k) after the 2005 bankruptcy amendments) applies to this pre-October 17, 2005, case and provides:

> An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

Under former subsection 362(h), the individual seeking damages has the burden of establishing by a preponderance of the evidence that (1) the actions taken were in violation of the automatic stay, (2) the violation was willful, and (3) the violation caused actual damages. *See Clayton v. King (In re Clayton)*, 235 B.R. 801, 806-07 & n.2 (Bankr. M.D.N.C. 1998); *see also In re Pawlowicz*, 337 B.R. 640 (Bankr. N.D. Ohio 2005); *Hampton v. Yam's Choice Plus Autos, Inc. (In re Hampton)*, 319 B.R. 163, 170-71 (Bankr. E.D. Ark. 2005).

---

finds that jurisdiction is lacking under 11 U.S.C. § 1334, this Court recommends that the district court reject Dawson's other possible bases for subject matter jurisdiction over her *adversary proceeding*. To the extent that federal question jurisdiction exists over Dawson's nonbankruptcy claims, Dawson would remain free to pursue such claims by filing a separate *civil action* in the district court.

*A.  J & B and Simone Violated the Automatic Stay by Failing to Disable the On-time System Promptly after Receiving Notice of the Filing of Dawson's Chapter 13 Bankruptcy Case.*

Once a voluntary bankruptcy case is filed, the automatic stay prevents "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" 11 U.S.C. § 362(a)(3) and (a)(6).  The continued operation of the on-time system in the Mustang after the filing of Dawson's Chapter 13 case violated both of these provisions of the automatic stay, particularly in connection with Simone's threatening remarks prepetition.  Given the pernicious nature of the on-time system, with the ever faster blinking red light and beeping, and given the potential for the vehicle not to start anytime after the payment due date, wherever the car happened to be driven, simply having the on-time system operating postpetition without a payment code constitutes a violation of the automatic stay. In fact, the on-time system has a doomsday quality reminiscent of the "doomsday machine" from the 1964 film "Dr. Strangelove or: How I Learned to Stop Worrying and Love the Bomb."[3]  Once installed and activated, the on-time system

[3] Another eerie similarity between this case and the Dr. Strangelove film is the disabling of the on-time system by Dawson's husband, just as a missile disabled the radio and nuclear launch code aboard the B-52 bomber captained by Air Force Major T. J. "King" Kong in the film.

16

will eventually disable the car's ignition system all on its own, absent some human intervention. Thus, a device installed prepetition requires human intervention to avoid a violation of the automatic stay postpetition.

While such a violation may not be actionable until after the creditor receives actual notice of the bankruptcy, simply having the system operational without a payment code or emergency codes available to the debtor is an act to exercise control over property of the estate or to collect on a prepetition claim in violation of the automatic stay.

Although Simone made her threatening comments to debtor and debtor's husband before the automatic stay took effect, those comments had an important effect upon the events that occurred once the Chapter 13 case was actually filed shortly thereafter and the automatic stay was in effect. The debtor no longer believed that Simone and J & B would honor the protections created by the Bankruptcy Code and the filing of the debtor's Chapter 13 case. Had J & B and Simone done nothing in violation of the automatic stay after Dawson's case was filed, then Simone's threatening comments prepetition would be harmless or at least not a violation of section 362, since the stay cannot be violated until a case is actually filed and the stay takes effect. *See In re Flack*, 239 B.R. 155, 163 (Bankr. S.D. Ohio 1999) ("[I]t is the filing of a petition and not the debtor's intent to file

17

which invokes the automatic stay . . . ." (quoting *In re Bragg*, 56 B.R. 46, 48 (Bankr. M.D. Ala. 1985)).

Had Simone not made her threatening remarks in response to Dawson's request for a new payment code on August 17, 2005, it might have been enough for Simone or J & B to contact Dawson, in response to her attorney's August 17, 2005, telefax message, and say: "Bring in the Mustang in the next day or two and we will remove the on-time system at no expense." Given her remarks, however, it was not enough for Paytosh to call on the morning of Saturday, August 20, 2005, and offer to take the Mustang back to J & B himself, remove the on-time system, and return the Mustang to Dawson's home. The Court therefore rejects the defendants' argument that simply offering on Saturday, August 20, 2005, to remove the on-time system was sufficient to avoid a violation of the automatic stay, at least under the circumstances of this case.

Simone testified that she preferred removing the on-time system to giving Dawson a code. Simone was afraid that a new code would be, at best, a temporary fix that would still leave J & B and herself liable if the system disabled the vehicle in the future. Such concern highlights the insidious nature of the device, and it is well-founded. In *Hampton*, 319 B.R. 163, a case involving a similar device, a creditor was found to have violated the automatic stay even though the creditor

18

was regularly providing codes to the debtor. Unfortunately, the codes given were not always correct, there were indications that the device was malfunctioning, and the device regularly disabled the debtor's vehicle.

Simone's preference for removing the on-time system was prudent, but under the circumstances her prudence was misplaced. Unlike in *Hampton*, Simone had no indication that an incorrect code would likely be given to Dawson, nor was there any indication that the system was malfunctioning. Instead, payment was past due, and disabling of the ignition system was imminent. Plus, Simone's threatening comments when Dawson prematurely reported filing of her bankruptcy case made the request to bring in the vehicle, without a payment code or emergency code, an unreasonable option, since Dawson could reasonably believe that her car was in fact being repossessed. Simone was not wrong is asking Dawson to bring in the Mustang so that the on-time system could be removed, nor in sending Paytosh to bring the Mustang in personally, but she should have provided a new code in the meantime. She did not.

In short, J & B and Simone violated the automatic stay by failing to adequately ensure that the system would not disable Dawson's Mustang after they had received notice of the bankruptcy filing. While the Court does not expect instantaneous compliance with section 362 upon receipt of notice, the Court does

19

expect those acts which violate the automatic stay to be stopped and/or corrected within a reasonable time. *See In re Flack*, 239 B.R. at 164; *see also In re Roberts*, 175 B.R. 339, 343 (9th Cir. B.A.P. 1994) ("[A] garnishing creditor has an affirmative duty to stop garnishment proceedings when notified of the automatic stay."); *accord In re Johnson*, 253 B.R. 857 (Bankr. S.D. Ohio 2000); *In re Sucre*, 226 B.R. 340 (Bankr. S.D.N.Y. 1998); *In re Lord*, 270 B.R. 787, 793 (Bankr. M.D. Ga. 1998); *In re Timbs*, 178 B.R. 989, 996-97 (Bankr. E.D. Tenn. 1994). For example, if the payment date is sufficiently far off, it may be enough simply to tell the debtor to bring the car in so the device can be removed while the debtor waits. If the payment date has already passed, then the same offer would probably be acceptable provided a new payment code or emergency code was promptly communicated to the debtor. In the present case, J & B's belated offer to take the Mustang away from the debtor to remove the on-time system was not sufficient to prevent the device from operating in violation of the automatic stay. Therefore, J & B and Simone violated section 362.

## B. The Violation of the Stay Was Willful.

Pursuant to former subsection 362(h), J & B and Simone are liable for actual damages caused by any "willful" violations of the automatic stay. "As used in § 362(h), 'willful,' unlike many other contexts, does not require any specific

20

intent." *In re Bivens*, 324 B.R. 39, 42 (Bankr. N.D. Ohio 2004). "[A creditor's] belief that withholding possession would not violate the stay does not preclude [a] finding that the intentional act of withholding possession was 'willful.' " *In re Sharon*, 234 B.R. at 687-88; *see also Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1104-05 (2d Cir. 1990); *In re Atlantic Bus. & Cmty. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990); *cf. Diviney v. NationsBank of Tex., N.A. (In re Diviney)*, 225 B.R. 762, 774 (B.A.P. 10th Cir. 1998) (explaining why term "willful" has different meaning in former subsection 362(h) than in subsection 523(a)(6)); *In re Robinson*, 228 B.R. 75, 80-81 n.5 (Bankr. E.D.N.Y. 1998) (same). "A violation of the automatic stay can be willful when the creditor knew of the stay and violated the stay by an intentional act." *In re Sharon*, 234 B.R. at 687-88; *see also Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 618 (9th Cir. 1993); *Lansdale Family Rests., Inc. v. Weis Food Serv. (In re Lansdale Family Rests., Inc.)*, 977 F.2d 826, 829 (3d Cir. 1992).

J & B and Simone received notice of the filing of Dawson's Chapter 13 bankruptcy case and thus knew of the stay as of Thursday, August 18, 2005. Although a belated attempt was made to remove the on-time system on Saturday, as discussed above, this was not reasonable under the circumstances. The

defendants could have given Dawson a temporary or interim code as early as Thursday, but chose not to do so. Such failure to take the necessary affirmative steps required to avoid violating the automatic stay can only be described as "willful." *See In re Hampton*, 319 B.R. at 171-72. In other words, J & B and Simone willfully violated the automatic stay when, after receiving notice of the filing of Dawson's Chapter 13 bankruptcy case, they failed to prevent the on-time system from disabling Dawson's Mustang.

### C. Dawson Is Entitled to Actual Damages Resulting from J & B's and Simone's Failure to Disable the On-time System Promptly after Receiving Notice of the Filing of Dawson's Chapter 13 Bankruptcy Case.

"An award of damages is mandatory under § 362(h) when a violation of the automatic stay is found to be 'willful.' " *In re Bivens*, 324 B.R. at 42; *see also In re Johnson,* 253 B.R. 857, 861 (Bankr. S.D. Ohio 2000). Costs and attorney fees are regularly awarded as actual damages from violations of the stay. *Cf. United States v. Harchar*, 331 B.R. 720 (N.D. Ohio 2005) (finding actual damages for willful violation of stay do not include intangible damages from emotional distress). A damage award must be supported by the evidence, rather than speculation and conjecture. *Archer v. Macomb County Bank,* 853 F.2d 497, 499 (6th Cir. 1988).

J & B and Simone willfully violated the automatic stay when they refused to

22

give Dawson a payment code or emergency code after receiving notice that Dawson had filed a Chapter 13 bankruptcy case. Dawson is entitled to "actual damages, including costs and attorneys' fees," resulting from the defendant's violation of the automatic stay. While the actions of Dawson's husband in trying to disable the on-time system are understandable, that does not make them acceptable or without consequences. Had Dawson's husband not attempted to disable the on-time system, Dawson might have gotten the Mustang back on September 1, 2005, without having to commence an adversary proceeding.

The Court declines to award punitive damages. *See Archer*, 853 F.2d at 500 (finding punitive damages appropriate if actual damage amount would not deter the creditor's "deliberate and repeated violations of the automatic stay"); *In re Bivens*, 324 B.R. at 42 ("[T]he imposition of punitive damages is not an action to be taken lightly, and . . . this Court has always exercised great restraint in making such an award. . . . [C]ases in which punitive damages have been awarded involve conduct that is egregious, vindictive, or intentionally malicious."). When Dawson filed for bankruptcy in August 2005, there was little bankruptcy experience with devices such as the on-time system, which would disable a car's ignition on its own, absent some human intervention. Should J & B and Simone commit a similar violation of the automatic stay in the future, however, punitive damages

23

might well be appropriate.

Dawson and her attorney have not indicated what actual damages occurred beyond the reasonable costs and attorneys' fees for the services of Mr. Romano. Dawson testified that as a result of not being able to drive the Mustang from August 20 to November 3, 2005, she and her husband had to delay appointments and depend upon friends for rides. Under these circumstances the court will award actual damages of $500 based upon Dawson's twice monthly payments of $100 owed to J & B on the loan for the Mustang for the approximately two and one-half months that she was unable to use the Mustang – *i.e.*, between August 20 and November 3, 2005. The Court finds that these car payments roughly equate to the economic loss from being unable to use the Mustang during this time period. *Cf. United States v. Harchar*, 331 B.R. 720 (N.D. Ohio 2005) (finding actual damages for willful violation of stay does not include intangible damages from emotional distress). In addition, the Court will give Dawson's counsel until August 11, 2006, to file an affidavit or declaration under penalty of perjury detailing any costs and attorneys' fees resulting from defendants' willful violation of the automatic stay. Defendants will then have until August 25, 2006, to file any brief in opposition. The Court will then take the matter under advisement in order to issue a final order awarding damages under former subsection 362(h).

24

Defendants assert that nothing prevented Dawson from picking up her inoperable car anytime after the on-time system was removed on September 1, 2005, and, consequently, they should not be liable for any damages after this date, since the damages were caused by Dawson's husband. The Court rejects this argument for several reasons. First, even if the actions of Dawson's husband caused the Mustang not to start after the on-time system was removed, the defendants knew shortly after Mr. C's returned the Mustang to J & B in early September that the repairs would cost less than $500. Dawson has not established by a preponderance of the evidence that *defendants* made the Mustang inoperable when Paytosh removed the on-time system, nor has Dawson established that defendants falsely asserted that the Mustang would not start as a ruse to keep the Mustang from Dawson. But, the Court does find by a preponderance of the evidence that the defendants knew the repairs would be substantially less than $500 when Mr. C's returned the Mustang to J & B in early September. Paytosh testified that he knew what needed to be done from Mr. C's, and the Court infers that Paytosh learned this around the time that Mr. C's returned the Mustang to J & B in early September. While Dawson testified that she did not have the ability to pay for a $500 repair bill, a repair bill of only $112 is another matter. Under these circumstances, the Court finds that defendants' failure to communicate this

25

information to Dawson constituted continuing damages to Dawson stemming from defendants' violation of the automatic stay.

Defendants also assert that any damages resulted from inaction by Dawson's counsel as opposed to defendants' own conduct. While the Court agrees that this litigation may have been unnecessary had Dawson's counsel taken more initiative and told Dawson that he would speak to J & B himself on Dawson's behalf as soon as the bankruptcy case was filed, the duty to avoid an ongoing violation of the automatic stay rests with the creditor. Dawson's counsel effectively communicated to the defendants the existence of the Dawson's bankruptcy case with his telefax late on the afternoon of Wednesday, August 17, 2005. By the morning of Thursday, August 18, 2005, defendants were on notice of Dawson's bankruptcy. Therefore, as of August 18, 2005, they had an affirmative duty to stop the ongoing violation of the automatic stay created by the on-time system's postpetition beeping and blinking and imminent threat of disabling the ignition of Dawson's Mustang. Moreover, nothing prevented defendants from immediately communicating a payment or emergency code to Dawson or her attorney. Finally, defendants' own threatening comments in response to Dawson's premature claim that she had filed for bankruptcy eliminated what might have otherwise been a reasonable option for correcting the violation of the automatic stay, *i.e.*, suggesting

26

that Dawson bring in the Mustang to have the on-time system removed.

*III. Dawson's Nonbankruptcy Claims, i.e., Those Not Arising under Title 11*

In addition to alleging claims against J & B Detail and Simone for damages under former subsection 362(h) of the Bankruptcy Code, Dawson's adversary complaint also asserts claims not arising under Title 11 against the same defendants. These nonbankruptcy claims are based upon (1) the Fair Debt Collection Practices Act, (2) the Ohio Retail Installment Sales Act, and (3) the Consumer Sales Practices Act. Since these claims are non-core matters, absent the parties' consent under 11 U.S.C. § 157, a bankruptcy judge lacks authority to enter final judgment concerning these claims. Rather, the bankruptcy judge may only make a recommended decision to the district court as to those non-core matters pursuant to 28 U.S.C. § 157(c)(1). As explained more fully below, the Court recommends that the district court enter judgment in favor of the defendants on all of Dawson's nonbankruptcy claims.

*A. The Fair Debt Collection Practices Act*

Dawson's complaint alleges that J & B and Simone violated the Fair Debt Collection Practices Act (FDCPA), 91 Stat. 874, codified at 15 U.S.C. § 1692 *et seq.*, by threatening "to illegally exercise control over the Mustang" by means of the on-time system, by allowing the on-time system to deactivate the Mustang, and

27

by repossessing the Mustang. Specifically, Dawson's complaint alleges that each of these actions are "unfair or unconscionable means to collect or attempt to collect [a] debt." 15 U.S.C. § 1692f. The Court need not decide whether such actions violate section 1692f because section 1692f does not apply to either J & B or Simone.

Section 1692f provides that "a *debt collector* may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f (emphasis added). The FDCPA provisions generally apply only to debt collectors. *See Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000) (citing *Pettit v. Retrieval Masters Creditors Bureau, Inc.*, 211 F.3d 1057, 1059 (7th Cir. 2000); *see also Piper v. Porntoff Law Assocs.*, 396 F.3d 227, 232-34 (3d Cir. 2005); *Neff v. Capital Acquisitions & Mgmt. Co.*, 352 F.3d 1118, 1121 (7th Cir. 2003); *James v. Ford Motor Credit Co.*, 47 F.3d 961, 962 (8th Cir. 1995) ("Congress enacted the FDCPA to help prevent *professional debt collectors* from using 'abusive, deceptive, and unfair' practices when collecting debts from consumers.") (emphasis added); *see generally Heintz v. Jenkins*, 514 U.S. 291 (1995) (holding that an attorney who regularly prosecutes collection litigation is a "debt collector" for purposes of FDCPA). Section 1692a provides in pertinent part:

(6) The term "debt collector" means any person who uses any

28

instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 808(6) [15 U.S.C. § 1692f(6)], such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include—

> . . . .
> (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (ii) concerns a debt which was originated by such person . . . .

15 U.S.C. § 1692a; *see generally Schooner v. Frankel*, 197 F.3d 1170, 1173-77

(6th Cir. 1999) (analyzing meaning of "regularly" under definition of "debt

collector").

At trial, the plaintiff presented no evidence to show that either J & B or

Simone "uses any instrumentality of interstate commerce or the mails in any

business the principal purpose of which is the collection of any debts." The only

evidence bearing on this issue tends to show that the principal business of J & B

and Simone is the selling of used cars. Nor did the plaintiff offer any evidence to

show that either J & B or Simone "regularly collects or attempts to collect, directly

or indirectly, debts owed or due or asserted to be owed or due another." The only

29

evidence relevant to the collection of any debt was the debt owed by the debtor. That debt was originated by J & B and Simone, and a person is not a debt collector whose collection activity "concerns a debt which was originated by such person." Finally, the plaintiff did not offer any evidence that J & B or Simone used another name to indicate that a third person was attempting to collect a debt. Therefore, the Court recommends that the district court enter judgment in favor of the defendants on Dawson's FDCPA claim, because the defendants are not "debt collectors" for purposes of the FDCPA.

### B. The Retail Installment Sales Act

Dawson also alleges violations of Ohio's Retail Installment Sales Act (RISA), codified at Chapter 1317 of the Ohio Revised Code. Specifically, Dawson alleges that by allowing the on-time system to disable the Mustang, the defendants repossessed the Mustang without satisfying the RISA's various notice requirements. Because the defendants did not repossess the Mustang for purposes of the RISA, the Court recommends that the district court enter judgment in favor of the defendants on Dawson's RISA claim.

Section 1317.12 of the RISA requires a secured party to provide specific notice to the debtor after the secured party takes possession of the collateral. *See generally Ford Motor Credit Co. v. Potts*, 47 Ohio St. 3d 97, 98-101 (1989)

30

(discussing notice requirements). Here, the defendants did not obtain possession of the Mustang when the on-time system disabled its ignition. By allowing the on-time system to disable her vehicle, the defendants did interfere with Dawson's use of the Mustang, but they did not deprive her of possession of it. The RISA contemplates only physical repossessions. This is evident from the requirement that "the secured party shall make the collateral available for inspection by the debtor during reasonable hours." O.R.C. § 1317.12(D). Also, if the debtor cures the default, "[t]he secured party shall assemble the collateral and make it available to the debtor at a time and a place that is reasonably convenient to both parties." *Id.* Finally, the RISA contemplates a repossession for the purpose of disposing of the collateral at a public sale. *See* O.R.C. §§ 1317.12 & 1317.16. Such a disposal requires physical possession.

The defendant's did obtain physical possession of the vehicle on September 1, 2005, but they did so with Dawson's consent and with Dawson riding in the tow truck. Moreover, the defendants did not take possession of the Mustang with an intent to sell it, as is case in a normal repossession, but instead the defendants attempted to repair the vehicle. While the parties disputed the amount of repairs needed, Dawson was free to have the car repaired at another repair shop once the on-time system was removed. Thus, none of the notice

31

requirements of the RISA was applicable.

Finally, even if the RISA requirements were applicable, it is not clear how Dawson would recover for these violations under the RISA. The only remedy provided for under the RISA is denial of a deficiency balance for collateral sold at a public sale. The collateral in this case, the Mustang, was returned to Dawson, so a deficiency balance is inapplicable. For these reasons, the Court recommends that the district court enter judgment in favor of the defendants on Dawson's RISA claim.

### C. The Consumer Sales Practices Act

Dawson's final claim is for violation of the Ohio Consumer Sales Practices Act (CSPA), codified at Chapter 1345 of the Ohio Revised Code. Dawson alleges that the defendants' violations of the Retail Installment Sales Act were "unconscionable act[s] or practice[s]," prohibited by O.R.C. § 1345.03(A). First, as discussed above, the defendants did not violate the RISA. Second, Dawson did not present any evidence that would independently support a claim for violation of the CSPA. O.R.C. § 1345.03(A) provides:

> No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

32

Subsection (B) of section 1345.03 lists seven circumstances that must be considered "in determining whether an act or practice is unconscionable." Dawson presented no evidence regarding any of the seven circumstances, nor did Dawson present evidence that any of the defendants' acts were unconscionable. Therefore, the Court recommends that the district court enter judgment in favor of the defendants on Dawson's CSPA claim.

## CONCLUSION

For the foregoing reasons, defendants J & B Detail, L.L.C. and Judy Simone willfully violated the stay, and Dawson is entitled to actual damages of $500, plus costs and attorney fees, resulting from the defendants' willful violation of the automatic stay. The Court declines to award punitive damages. Dawson's counsel has until August 11, 2006, to file an affidavit or declaration under penalty of perjury detailing any costs and attorneys fees resulting from defendants' willful violation of the automatic stay. Defendants will then have until August 25, 2006, to file any brief in opposition.

In addition, pursuant to 28 U.S.C. § 157(c)(1) and Fed. R. Bankr. P. 9033(a), the Court enters and submits these proposed findings of fact and conclusions of law to the United States District Court *as to Dawson's nonbankruptcy claims*. Within the time period prescribed by rule, any party may

33

file with the bankruptcy clerk any written objections to these proposed findings of fact and conclusions of law. *See* Fed. R. Bankr. P. 9033(b) & (c). Pursuant to 28 U.S.C. § 157(c)(1) and Fed. R. Bankr. P. 9033(d), the district court will enter a final order or judgment *as to Dawson's nonbankruptcy claims* after de novo of those matters to which any party has lodged a timely objection.

IT IS SO ORDERED.

Arthur I. Harris
United States Bankruptcy Judge

## OBJECTIONS

Pursuant to Rule 9033 of the Federal Rules of Bankruptcy Procedure, any objections to these proposed findings of fact and conclusions of law must be filed with the Clerk of Courts **within 10 days of receipt of this notice**. Failure to file objections within the specified time may constitute a waiver of the right to appeal the District Court's order. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986). The written objections should identify the specific proposed findings or conclusions objected to and state the grounds for such objection. A party may respond to another party's objections within 10 days after being served with a copy thereof.

34